IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| HENRY J. LACHER, DAVID MASONOFF, WILLIAM WERONKO and LEVI GASTON, on behalf of themselves and others similarly situated, | : : : : : | 2:19-cv-00687-JP |
| Plaintiffs, | : : | CLASS ACTION |
| v. | : : | JURY TRIAL DEMANDED |
| ARAMARK CORPORATION, | : : |  |
| Defendant. | : : |  |

**AMENDED COMPLAINT – CLASS ACTION**

Henry J. Lacher ("Lacher"), David Masonoff ("Masonoff"), William Weronko ("Weronko"), and Levi Gaston ("Gaston") (collectively "Plaintiffs") bring this class-action lawsuit against Aramark Corporation ("Defendant"). Plaintiffs assert nationwide class-action claims for breach of contract, promissory estoppel, and unjust enrichment. See Counts I-III. In addition, Lacher, Masonoff, and Weronko assert state-specific claims on behalf of themselves and other employees in South Carolina, North Carolina, and Illinois. See Counts IV-VII. As summarized in this complaint, Plaintiffs' legal claims generally stem from Defendant's failure to pay managerial bonuses earned by Plaintiffs and other class members in Fiscal Year 2018.

**PARTIES**

1.      Lacher is a citizen and resident of Greenville, SC.

2.      Masonoff is a citizen and resident of LaVergne, TN.

3.      Weronko is a citizen and resident of Dixon, IL.

4.      Gaston is a citizen and resident of Humble, TX.

5.      Defendant is a corporation headquartered in Philadelphia, PA.

**JURISDICTION AND VENUE**

6.      This Court has jurisdiction under 28 U.S.C. § 1332(d) because the potential classwide damages exceed $5 million, and Plaintiffs and other class members are citizens of states different from Defendant.

7.      Venue is proper in this Court under 28 U.S.C. § 1391 because Defendant is headquartered in Philadelphia, PA, and, upon information and belief, the conduct giving rise to Plaintiffs' claims was committed, at least in part, in Philadelphia, PA.

**FACTS**

8.      Defendant is in the business of providing food, facilities, and uniform services to schools, universities, hospitals, convention centers, sports/entertainment venues, and other customers throughout the world.

9.      Defendant's fiscal year runs from October 1 to September 30.

10.     Defendant reportedly enjoyed record revenues and profits in fiscal year 2018 and increased its shareholder dividends by 5% in the latest quarter.

11.     Defendant classifies its managerial employees as falling within various "Career Bands."  Career Band 1 is the highest level of management, while Career Band 8 is the lowest level of management.

12.     Defendant currently employs Lacher as a manager falling within Career Band 5.

13.     Prior to approximately January 2019, Defendant employed Masonoff as a manager falling within Career Band 7.

14.     Defendant employs Weronko as a manager falling within Career Band 7.

15.     Prior to approximately October 2018, Defendant employed Gaston as a manager falling within Career Band 7.

16.     At or around the beginning of each fiscal year, Defendant publishes standardized

Bonus Plans that apply to its managers.  Managers falling within Career Bands 3-5 are paid

bonuses pursuant to an annual Management Incentive Bonus Plan (hereinafter "MIB Plan").

Meanwhile, managers falling within Career Bands 6-8 are paid bonuses pursuant to an annual

Front Line Manager Bonus Plan (hereinafter "FLM Plan").

17.     Defendant's MIB and FLM Plans are written to provide Plaintiffs and other

bonus-eligible managers with a specific description of the manner in which their bonuses will be

calculated.  This is not surprising, since such specificity is required under many states' wage

laws.  For example, the North Carolina Wage and Hour Law – which applies to Masonoff's

employment – requires employers to "notify employees of the employers' policies and practices

concerning . . . wages based on bonuses," 13 N.C. Admin. Code § 12.0307(b), and requires that

such notifications address "[h]ow and when bonuses . . . are earned so that the employees know

the amount of bonuses . . .  to which they are entitled," id. at § 12.307(d).

18.     At the time of hire, Defendant promises managers that they will receive bonus

payments for each fiscal year in accordance with the applicable MIB or FLM Plan.  These

promises are made verbally during job interviews and through formal offer letters.  See, e.g.,

Exhibit A (Lacher offer letter), Exhibit B (Gaston offer letter),[1] and Exhibit C (Masonoff offer

letter).

19.     During all fiscal years prior to 2018, Defendant paid Plaintiffs and other bonus-

eligible managers bonus payments in accordance with the applicable MIB or FLM Plan

published at the beginning of the applicable fiscal year.  This consistent pattern of conduct

---

[1]  Gaston only retains an unsigned version of the offer letter.  He believes that Defendant will
have the signed version in its records.

3

reinforced Defendant's promise – made at the time of hire to Plaintiffs and other managers – that bonus payments would be made at the end of each fiscal year.

20.     In February 2018, Defendant sent all managers falling within Career Bands 3-5 the "FY2018 Management Incentive Bonus (MIB) Plan."  See Exhibit D.  Likewise, in February 2018, Defendant sent all managers falling within Career Bands 6-8 the "FY2018 Front Line Manager (FLM) Bonus Plan."  See Exhibit E.  These bonus plans will be referred to collectively as the "FY2018 Bonus Plans."

21.     Defendant's 2018 fiscal year ended on September 30, 2018.  Plaintiffs – like hundreds, and possibly thousands, of other managers employed during FY 2018 – were owed bonus pay pursuant to the FY2018 Bonus Plans.  In particular: Lacher was owed over $40,000; Masonoff was owed approximately $8,000-10,000; Weronko was owed approximately $15,000; and Gaston was owed approximately $11,500.

22.     In the months surrounding the September 30, 2018 end of FY 2018, Defendant presented terminated employees throughout the United States with standardized severance agreements that reiterated Defendant's ongoing promise to pay bonuses to bonus-eligible managers.  For example, the severance agreement given to employees terminated between July 1, 2018 and September 30, 2018 stated that such employees would "be eligible to receive a pro-rated bonus" notwithstanding the general rule that a manager "must be an employee of Aramark on the last day of the fiscal year in order to be eligible to receive a bonus for such fiscal year." Meanwhile, the standardized severance agreement for employees terminated in the months immediately following the September 30, 2018 end of FY 2018 stated: "In accordance with the terms of the Management Incentive Bonus Plan, an employee must be an employee of Aramark on the last day of the fiscal year in order to be eligible to receive a bonus for such fiscal year.

4

*Accordingly, you will be eligible to receive a bonus under the Management Incentive Bonus Plan for fiscal year 2018.*" (emphasis supplied).

23.     On December 3, 2018, Defendant sent managers an email titled: "Attention Required: Important Notice Regarding FY 18 Bonus."  This email was addressed to "All US Bonus Eligible Employees" and stated: "This is to inform you that bonus payments, historically paid in December, *will be paid in February*."  See Exhibit F (emphasis supplied).

24.     On January 29, 2019, Defendant sent managers an email reiterating the promise that the FY 2018 bonus payments would be made on February 15, 2019.  See Exhibit G.

25.     The above are just some examples of Defendant's companywide promises that managers would receive FY 2018 bonus payments.  Plaintiffs believe discovery will uncover additional companywide evidence as well as manager-specific evidence.  See, e.g., Exhibit H (September 26-27, 2018 email string in which HR staff confirms that Gaston "will be eligible for his bonus payout for 2018").

26.     On February 1, 2019, Defendant sent an email to Plaintiffs and other managers stating that it was not making any Bonus payments for FY 2018.  See, e.g., Exhibit I (February 1, 2019 email to Lacher).

## CLASS ACTION ALLEGATIONS

27.     Plaintiffs bring Counts I-III on behalf of a class consisting of all managers employed by Defendant in the United States in Career Bands 5-8 who (i) were eligible for bonus pay under an FY 2018 Bonus Plan and (ii) have not received all bonus pay owed.

28.     Lacher brings Counts IV-V on behalf of a sub-class class consisting of all managers employed by Defendant in South Carolina in Career Bands 5-8 who (i) were eligible for bonus pay under an FY 2018 Bonus Plan and (ii) have not received all bonus pay owed.

29.     Masonoff brings Count VI on behalf of a sub-class class consisting of all managers employed by Defendant in North Carolina in Career Bands 5-8 who (i) were eligible for bonus pay under an FY 2018 Bonus Plan and (ii) have not received all bonus pay owed.

30.     Weronko bring Counts VII on behalf of a sub-class class consisting of all managers employed by Defendant in Illinois in Career Bands 5-8 who (i) were eligible for bonus pay under an FY 2018 Bonus Plan and (ii) have not received all bonus pay owed.

31.     Class-action treatment of Plaintiffs' claims is appropriate because, as alleged below, all of the class-action requirements of Rule 23 of the Federal Rule of Civil Procedure are satisfied.

32.     The classes, upon information and belief, each include hundreds – and possibly thousands – of individuals, all of whom are readily ascertainable based on Defendant's payroll records and are so numerous that joinder of all class members is impracticable.

33.     Plaintiffs are class members, their claims are typical of the claims of other class members, and they have no interests that are antagonistic to or in conflict with the interests of other class members.

34.     Plaintiffs and their lawyers will fairly and adequately represent the class members and their interests.

35.     Questions of law and fact are common to all class members, because, *inter alia,* this action concerns Defendant's common compensation policies, as described herein.  The legality of these policies will be determined through the application of generally applicable legal principles to common facts.

36.     Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because common questions of law and fact predominate over questions affecting only individual

class members and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.

## COUNT I – Breach of Contract

37.     All prior paragraphs are incorporated herein.

38.     Under basic common-law principles applicable in Pennsylvania and throughout the United States, Defendant had a contractual obligation to make FY 2018 bonus payments to Plaintiffs and other class members.

39.     Defendant breached its contractual obligations by failing to make FY 2018 bonus payments to Plaintiffs and other class members.

40.     Defendant's contractual breach has damaged Plaintiffs and other class members, all of whom would have received monetary bonus payments in the absence of such breach.

## COUNT II – Promissory Estoppel

41.     All prior paragraphs are incorporated herein.

42.     This promissory estoppel claim is pled in the alternative and should be reached if the Court or factfinder rejects Plaintiffs' breach of contract claim.

43.     Defendant's conduct and representations, as summarized in this complaint, were sufficient to reasonably induce bonus-eligible managers to expect that Defendant would make FY 2018 bonus payments, and, in fact, Plaintiffs harbored such an expectation in good faith reliance on Defendant's conduct and representations.

44.     Failure by this Court to enforce Defendant's promise to make FY 2018 bonus payments would cause a great injustice to Plaintiffs and the class members and an unfair financial windfall to Defendant.

45.     As such, Plaintiffs and the class members are owed their FY 2018 bonus – along

with any other damages deemed appropriate by the Court – under the promissory estoppel

doctrine.

## COUNT III – Unjust Enrichment

46.     All prior paragraphs are incorporated herein.

47.     This unjust enrichment claim is pled in the alternative and should be reached if

the Court or factfinder rejects Plaintiffs' breach of contract claim.

48.     Under basic common-law principles applicable in Pennsylvania and throughout

the United States, the unjust enrichment doctrine applies when the plaintiff has conferred a

benefit that has been appreciated by defendant under inequitable circumstances.  See, e.g., EBC,

Inc. v Clark Building Systems, Inc., 618 F.3d 253, 273 (3d Cir. 2010).

49.     Here, Plaintiffs and the class members have conferred a significant benefit on

Defendant by working throughout FY 2018 under the reasonable and good faith expectation that

they would be paid bonuses in accordance for FY 2018.  Moreover, Defendant has appreciated

the benefits of such labor under inequitable circumstances.

50.     As such, Plaintiffs and the class members are owed their FY 2018 bonus – along

with any other damages deemed appropriate by the Court – under the unjust enrichment doctrine.

## COUNT IV – Breach of Contract Accompanied by a Fraudulent Act

51.     All prior paragraphs are incorporated herein.

52.     Defendant breached its employment agreement with Lacher and other South

Carolina class members as alleged in detail above.

53.     In breaching its contractual obligations, Defendant acted with a fraudulent intent

by, for example: (a) misleading Lacher and others into believing that the FY 2018 bonus

payments would be delayed from December 2018 until February 2019 but eventually paid and

8

(b) moving the accrued FY 2018 bonus payment liability onto to the company's bottom line at the very end of the fiscal year to inflate company earnings.

54.     Defendant's conduct has caused Lacher and other South Carolina class members to suffer substantial economic and non-economic damages.

55.     Lacher and other South Carolina class members are entitled to recover actual damages from Defendant sufficient to compensate them for their actual damages.

56.     In addition, Lacher and other South Carolina class members are entitled to an award of punitive damages against Defendant, in an amount to be determined by the jury at trial, sufficient to deter this Defendant and others from engaging in such wrongful and fraudulent conduct in the future.

## COUNT V – South Carolina Payment of Wages Act

57.     All prior paragraphs are incorporated herein.

58.     Defendant owes Lacher and other South Carolina class members "wages" as defined in section 41-10-10(2) of the Act, to compensate them for labor rendered to Defendant as required by their positions and Defendant's bonus plans.

59.     Defendant has failed to pay Lacher and other South Carolina class members all wages due, as required by sections 41-10-40 and -50 of the Act.  Lacher is informed and believes that the amount of unpaid annual bonus due to him alone exceed $40,000.00.

60.     On or about February 1, 2019, Defendant announced that no managers in Bands 5-8 would receive any bonus payments for FY2018.  Defendant retroactively attempted to alter the terms and conditions of Lacher's employment and the employment of other South Carolina class members without providing at least 7-days' advanced, written notice of such proposed change, in violation of S.C. Code Ann. § 41-10-30.

9

61.     Defendant's failure to pay Lacher and other South Carolina class members all wages due to them was willful, without justification, and in violation of the duty of good faith and fair dealing.

62.     Upon information and belief, pursuant to section 41-10-80(C) of the Act, Lacher and other South Carolina class members are entitled to recover in this action an amount equal to three times the full amount of their unpaid wages, plus costs and reasonable attorney's fees.

## COUNT VI – North Carolina Wage and Hour Act

63.     All prior paragraphs are incorporated herein.

64.     The North Carolina Wage and Hour Act ("NCWHA") requires employers to pay employees all owed wages, see N.C. Gen. Stat. § 95-25.6, and defines wages broadly to include the bonus payments at issue in this action, see id. at § 95-25.2(16).  Moreover, under the NCWHA, promised bonus payments "cannot be reduced or eliminated as a result of a change in policy or practice."  13 N.C. Admin. Code § 12.0307.

65.     Defendant violated the NCWHA by failing to pay Masonoff and other North Carolina class members their FY 2018 bonuses.

## COUNT VII – Illinois Wage Payment and Collection Law

66.     All prior paragraphs are incorporated herein.

67.     The Illinois Wage Payment and Collection Law ("IWPCL") requires employers to pay employees all owed wages, see 820 Ill. Comp. Stat. at § 115/4, and defines wages broadly to include the bonus payments at issue in this action, see id. at § 115/2.

68.     Defendant violated the IWPCL by failing to pay Weronko and other Illinois class members their FY 2018 bonuses.

10

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully request that the Court enter judgment in their favor and award the following relief:

a. Certification of the class and sub-classes under Federal Rule of Civil Procedure 23;

b. All unpaid bonuses and other monetary damages owed to Plaintiffs and the class members;

c. Pre-judgment interest;

d. Any liquidated damages, treble damages, or penalties available under the above-cited laws of South Carolina, North Carolina, and Illinois;

e. Attorneys' fees and costs; and

f. Such further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiffs demand a jury trial as to all claims so triable.

Dated: February 26, 2019     Respectfully submitted,

Peter Winebrake
R. Andrew Santillo
Mark Gottesfeld
WINEBRAKE & SANTILLO, LLC
715 Twining Road, Suite 211
Dresher, PA 19025
(215) 884-2491 (office)
(215) 884-2492 (facsimile)
pwinebrake@winebrake.law.com

David E. Rothstein*
ROTHSTEIN LAW FIRM, PA

11

1312 Augusta Street
Greenville, South Carolina 29605
(864) 232-5870 (Office)
(864) 241-1386 (Facsimile)
drothstein@rothsteinlawfirm.com

Harold Lichten*
Shannon Liss-Riordan*
Michelle Cassorla*
LICHTEN & LISS-RIORDAN, P.C.
729 Boylston Street, Suite 2000
Boston, MA  02116
(617) 994-5800 (office)
(617) 994-5801 (facsimile)
hlichten@llrlaw.com
sliss@llrlaw.com

Attorneys for Plaintiffs
 * *Pro hac vice* application forthcoming

# Exhibit A



March 8, 2016

Henry Lacher

████████████████

Dear Henry,

**Congratulations!** We are excited to offer you the opportunity to join the Aramark team.  Here are the employment offer details:

## Position, Pay and Benefits

**Position:** Your position will be that of Facilities District Manager, Career Band 5, reporting to Mary Thornton.

**Start Date:** Your start date will be 4/11/2016.

**Compensation:** Your salary will be $128,000.00 annually. You will be paid bi-weekly.  Your position is exempt, which means that you are not eligible to receive overtime pay. Your hours may fluctuate from week to week and the salary you receive for each week is intended to compensate you for all hours worked that week.

**Management Incentive Bonus:** You will be eligible to participate in Aramark's Management Incentive Bonus (MIB) Plan for Fiscal Year 2016.  As further described in the Plan, if you are eligible to receive a Management Incentive Bonus, the amount of your Bonus will be determined on the basis of Aramark performance measured against certain annual financial and/or non-financial goals, objectives and achievements.  The guideline bonus for your new position is 22% of your base salary, less payroll taxes and other deductions.  Your actual bonus paid in Fiscal Year 2016 will be pro-rated as appropriate.

**Relocation:** Aramark will facilitate your relocation.  The relocation benefits will be paid as described in the Aramark Relocation Policy (enclosed).  By signing this offer letter, you agree that, should you voluntarily decide to leave Aramark's employment at any time within 12 months of your relocation date, you will reimburse Aramark for the above mentioned relocation assistance described in the Aramark Relocation Policy document.

**Company Car Program:**  You will be eligible for our Company Car Program. You are eligible to enroll in the program upon your initial start date and a company car and specific details of the program will be made available to you at that time.

**Benefits:**  You will be eligible to participate in Aramark's Salaried Benefits Program, subject to the terms and conditions of such benefits and benefit plans, and subject to any legal requirements or limitations.  These benefits include, but are not limited to, medical, life, and disability insurances, Aramark's Employee Assistance Program, Retirement Income Plan and paid time off.

## Pre-Employment Paperwork and Other Requirements

**Background Check/Drug Test:**  Aramark conducts pre-employment background checks for all new hires.  The background check may include, but is not limited to, one or more of the following: criminal history check, sexual offender registry check, fingerprinting, health screening, employment history verification and/or reference check.  In addition, a drug test may be required for this position.  This offer of employment is contingent upon satisfactory background check results and, if applicable, drug test results.  If a pre-employment drug test is required, instructions regarding completion of the drug test are enclosed with this letter, and the drug test must be completed within five (5) calendar days of receipt of this letter.

**Documents to Complete in Paper and Electronically**:   There are a number of documents enclosed with this letter.  Please review them carefully, completing and **immediately returning** those that require your completion. These include, but are not limited to, the following:

- Business Conduct Policy;
- Background Investigation Disclosure and Authorization Notice;
- Criminal History Disclosure Form:
- Drug and/or Alcohol Testing Consent Form;

There are additional documents that must be completed electronically.  These include Section 1 of the Form I-9, payment method election, W-2 receipt method election, Affordable Care Act Notice, and Work Opportunity Tax Credit questionnaire.  Upon completion of satisfactory background checks you will receive an email with information and directions to complete these forms electronically. **These documents must be completed no later than your first day of work.**

**Form I-9:**  In order for Aramark to comply with the Immigration Reform and Control Act, you must provide documentation confirming your identity and eligibility to work in the United States within three (3) business days of your first day of work with Aramark. A copy of the Form I-9 Lists of Acceptable Documents is enclosed with this letter.  Please note that because Aramark participates in E-Verify, we can accept only those List B documents that contain a photograph.

## Other Information

**Proprietary Information:** During the course of your employment with Aramark, you will receive information and documents from Aramark that contain confidential or proprietary trade information concerning Aramark's business and business relationships ("Proprietary Information"). By accepting our offer of employment, you agree that at no time while employed by Aramark, or after the employment has ended for any reason, will you use any Proprietary information for any purpose not related to your employment duties at Aramark, or disclose any Proprietary Information to any person, firm or entity not associated with Aramark. At the end of your employment with Aramark, you agree that you will return to Aramark all such Proprietary Information, including, but not limited to, all manuals, client and supplier lists, and training and policy materials, as well as all Aramark property.

**Non-Competition:** By signing and accepting this offer, you agree that, for a period of twelve (12) months following termination of your employment with Aramark, you will not directly or indirectly, without Aramark's prior written permission, on your behalf or on behalf of any person, firm, corporation or other entity, be engaged in or in any way be concerned with or solicit or negotiate for the operation, management or provision of any hospitality and/or food services at any location within the your area of geographic responsibility at which:

(i)         Aramark operated, managed or supervised such services at the time of termination of employee's employment; or

(ii)        Aramark either (a) had solicited or negotiated a contract for such operation, management or provision immediately preceding termination of employee's employment or (b) is continuing to solicit or negotiate a contract for such operation, management or provision at the time of termination of employee's employment.

The terms "negotiating", "negotiations", and "negotiate" shall include but not be limited to actual bargaining in connection with the terms of a proposed contract and any or all of the stages which usually precede successful contract negotiations, including, by way of example, prospect solicitation, survey of the facility or installation, ascertaining of service specifications and the formulation of recommendations concerning changes, if any, in food service techniques, procedures and methods, and the preparation and presentation of a proposal or proposed contract.

You acknowledge that enforcement of the provisions set forth in this section will not unduly impair your ability to obtain other employment following the termination (voluntary or involuntary) of your employment with ARAMARK. You further acknowledge that in the event of any violation by you of the provisions set forth in this section, Aramark will sustain serious, irreparable and substantial harm in its business, the extent of which will be difficult to determine and impossible to remedy by an action at law for money damages. Accordingly, you agree that, in the event of such violation or threatened violation by you, Aramark shall be entitled to an injunction before trial from

any court of competent jurisdiction as a matter of course upon the posting of no more than a nominal bond, in addition to all such other legal and equitable remedies as may be available to Aramark. You further agree that in the event any of the provisions of this letter are determined by a court of competent jurisdiction to be contrary to any applicable statute, law or rule, or for any reason unenforceable as written, such court may modify any of such provisions so as to permit enforcement thereof as thus modified.

**Employment At Will:** Your employment with Aramark is "at will", which means that either you or Aramark can terminate your employment relationship at any time for any reason, with or without cause and with or without notice. Because your employment with Aramark will be "at will", neither this offer of employment nor any other Aramark communication or document given to you shall alter, or shall be deemed or interpreted to alter, the "at will" employment relationship between you and Aramark.

**Offer Contingency:** This offer of employment with Aramark is contingent upon the following:

- Your ability to provide timely and satisfactory documentary proof of your identity and eligibility to work in the United States as described above.
- Satisfactory background check and, if applicable, drug test results, as well as successful completion of the conditional applicant health process.
- Your return of the enclosed copy of this letter, after being signed by you without modification, no later than 3/11/2016, after which time this offer will expire.

**Entire Agreement:** This letter sets forth the entire understanding between you and Aramark with respect to all aspects of the offer of employment. Any and all previous agreements or understandings between or among you and Aramark regarding topics addressed in this letter, whether written or verbal, are superseded by this letter. Any modifications to this letter must be in writing and signed by both you and Aramark.

Again, congratulations! We are excited to have you join the Aramark team. If you have any questions, feel free to contact me at (215) 238-7179.

Sincerely,

*Jodie Spor*

Jodie Spor
spor-jodie@aramark.com

Please return the signed offer letter to the Education HRSS Team via scanned copy to educationhrss@aramark.com no later than 3/11/2016.

HENRY LACHER
(Please Print Name)

(Please Sign Name)

3 - 8 - 1 6
Date

## PROPRIETARY INFORMATION AND POST-EMPLOYMENT RESTRICTIONS AGREEMENT

In consideration of:  (a) the decision of Aramark, its parent corporation and affiliated entities (collectively referred to as the "Company") to provide me with access to Proprietary Information to further my opportunities for success while providing service on behalf of the Company; (b) my employment or continued employment in the position of Facilities District Manager  with the Company; and (c) my continued eligibility to participate in the Aramark annual incentive bonus plan subject to the terms of the plan (each of which independently is in consideration of my agreements set forth below), I hereby enter into this *Proprietary Information and Post-Employment Restrictions Agreement* (the "**Agreement**") and agree as follows:

### 1. Nondisclosure.

**1.1 Recognition of Company's Rights; Nondisclosure.**    I understand and acknowledge that my employment by the Company creates a relationship of confidence and trust with respect to the Company's Proprietary Information (defined below) and that the Company has a protectable interest therein.

**1.2 Proprietary Information.** The term "**Proprietary Information**" shall mean any and all confidential and/or proprietary knowledge, data or information of the Company, its affiliates, alliance members, parents and subsidiaries, developers, partners, customers and prospective customers, whether having existed, now existing, or to be developed during my employment.   By way of illustration but not limitation, "**Proprietary Information**" includes (a) trade secrets, inventions, mask works, ideas, processes, formulas, source and object codes, data, programs, other works of authorship, know-how, improvements, discoveries, developments, designs and techniques and any other proprietary technology (hereinafter collectively referred to as "**Inventions**"); (b) information regarding research, development, new products, marketing and selling, business plans, budgets and unpublished financial statements, licenses, prices and costs, margins, discounts, credit terms, pricing and billing policies, quoting procedures, methods of obtaining business, forecasts, future plans and potential strategies, financial

projections and business strategies, operational plans, financing and capital-raising plans, activities and agreements, internal services and operational manuals, methods of conducting business, suppliers and supplier information, and purchasing; (c) information regarding customers and potential customers of the Company ("**Customers**"), including customer lists, names, representatives, their needs or desires with respect to the types of products or services offered by the Company, proposals, bids, contracts and their contents and parties, the type and quantity of products and services provided or sought to be provided to customers and potential customers of the Company and other non-public information relating to customers and potential customers; (d) information regarding any of the Company's business partners, alliance members and their services, including names; representatives, proposals, bids, contracts and their contents and parties, the type and quantity of products and services received by the Company, and other non-public information relating to business partners and alliance members; (e) information regarding the Company's employees and consultants ("**Service Providers**"), lists of Service Provider names and other information, compensation, performance and skills; (f) valuable confidential business information of the Company that does not qualify as a trade secret; (g) any other non-public information which a competitor of the Company could use to the competitive disadvantage of the Company; and (h) any intellectual property transferred to the Company from its predecessors or their former affiliates. Notwithstanding the foregoing, it is understood that Proprietary Information excludes information that is generally known in the trade or industry through no breach of this Agreement or other wrongful act or omission by me.

**1.3 Nondisclosure.** At all times during my employment and at all times thereafter, I will hold in strictest confidence and will not disclose, use, lecture upon or publish any of the Company's Proprietary Information, except as such disclosure, use or publication may be required in connection with my work for the Company, or unless the President of the Company expressly authorizes such in writing. I will obtain the Company's written approval before publishing or submitting for publication any material (written, verbal, or otherwise) that relates to my work at the Company and/or incorporates any Proprietary Information. I hereby assign to the Company any rights I may have or acquire in such Proprietary Information and recognize that all Proprietary Information shall be the sole property of the Company and its assigns. I will take all reasonable precautions to prevent the inadvertent or accidental disclosure of the Company's Proprietary Information. I understand and agree that the covenants, restrictions and prohibitions against disclosure of Proprietary Information are in addition to, and not in lieu of, any rights or remedies which the Company may have available pursuant to the laws of any jurisdiction or at common law to prevent disclosure of trade secrets or proprietary information, and the enforcement by the Company of its rights and remedies pursuant to this Agreement shall not be construed as a waiver of any other rights or available remedies which it may possess in law or equity absent this Agreement.

**1.4 Third Party Information.** I understand, in addition, that the Company has received in confidence and in the future will receive in confidence from third parties, including (without limitation), affiliates, alliance members, developers and partners of the Company or its predecessors, confidential and/or proprietary information and data, and trade

secrets belonging to such third parties ("**Third Party Information**"). During my employment and thereafter, I will hold Third Party Information in the strictest confidence and will not use it, nor will I disclose it to anyone (other than Company personnel who need to know such information in connection with their work for the Company), except in connection with my work for the Company, or unless expressly authorized in writing by the President of the Company.

**1.5 No Improper Use of Information of Prior Employers and Others.** During my employment by the Company I will not improperly use or disclose any confidential or proprietary information or trade secrets, if any, of any former employer or any other person or entity to whom I have an obligation of confidentiality, and I will not bring onto the premises of the Company any unpublished documents or any property belonging to any former employer or any other person or entity to whom I have an obligation of confidentiality unless consented to in writing by that former employer, person or entity. Notwithstanding the foregoing, it is understood that, at all such times, I am free to use information that is generally known in the trade or industry through no wrongful act or omission by me of my obligation of confidentiality to any former employer or other person or entity.

**2. Duty of Loyalty & Best Efforts During Employment.** I agree that during the period of my employment by the Company I will not, without the Company's express written consent, engage in any employment or business activity that (i) is competitive in any way with the business, or planned business, of the Company or (ii) would conflict with, or otherwise interfere with my ability to satisfactorily perform the duties and responsibilities of, my employment by the Company. I also agree to use my best efforts and full time business time in advancing the interests of the Company during my employment.

**3. No Solicitation of Employees, Service Providers, or Customers and No Competition agreement.** I agree that during the period of my employment with the Company, and for the period of one (1) year after the date my employment with the Company ends for any reason, including, but not limited to, voluntary termination by me or involuntary termination by the Company, I will not, as an officer, director, employee, consultant, owner, partner of another person or entity, or in any other capacity, either directly or through others:

**3.1**       solicit, induce, encourage, or participate, directly or indirectly, in soliciting, inducing, or encouraging any employee or Service Provider to terminate or reduce his or her relationship with the Company.

**3.2**       solicit, divert or appropriate or attempt to solicit, divert or appropriate, by use of Proprietary Information or otherwise, any Customer of the Company with whom I had contact and/or about which I had Proprietary Information during my employment with the

Company, for the purpose of selling or providing to that Customer any services or products competitive with those available from the Company.

**3.3**          directly or indirectly, become employed by or provide services to (as an employee, consultant or otherwise), or acquire or maintain any ownership interest in, any business where such business is competitive in any way with any business lines in which I worked for the Company during the last two years of my employment. Given that the Proprietary Information to which the Company has provided me access is broadly transferrable, this restriction shall apply to services performed by me anywhere in North America.

**3.4**     The post-termination restrictions of Section 3.3 will not apply and will not be enforced by the Company with respect to post-termination competitive activity by me that occurs in California.

## 4. Reasonableness of Restrictions.

**4.1** I agree that I have read this entire Agreement and understand it.  I agree that this Agreement does not prevent me from earning a living or pursuing my career.  I agree that the restrictions contained in this Agreement are reasonable, proper, and necessitated by the Company's legitimate business interests.  I represent and agree that I am entering into this Agreement freely and with knowledge of its contents with the intent to be bound by the Agreement and the restrictions contained herein.

**4.2** In the event that, any one or more of the restrictions or obligations of Sections 1, 2, 3, and/or 5 of this Agreement shall for any reason be held to be unenforceable for any reason including, but not limited to, being excessively broad as to duration, scope, activity or subject, it shall be construed or modified by limiting and reducing it, so as to provide the Company with the maximum protection of its business interests and yet be enforceable under the applicable law as it shall then appear.

## 5. Legal and Equitable Remedies.

**5.1** I agree that it may be impossible to assess the damages caused by my violation of this Agreement or any of its terms.  I agree that any threatened or actual violation of this Agreement or any of its terms will constitute immediate and irreparable injury to the Company and the Company shall have the right to enforce this Agreement and any of its provisions by injunction, specific performance or other equitable relief, without bond and without prejudice to any other rights and remedies that the Company may have for a breach or threatened breach of this Agreement.

**5.2** I agree that if the Company is successful in whole or in part in any legal or equitable action against me under this Agreement, the Company shall be entitled to payment of all costs, including reasonable attorney's fees, from me.

**5.3** In the event that the Company enforces this Agreement through a court order, I agree that the restrictions of Section 3 shall remain in effect for a period specified in the order enforcing this Agreement, and I understand and agree that such period may extend the date specified in Section 3 in order to remedy any period of my violation of Section 3.

**6. Notification Of New Employer.** In the event that I leave the employ of the Company, I hereby consent to the notification of my new employer of my rights and obligations under this Agreement.

**7. General Provisions.**

**7.1 Governing Law.** To the maximum extent permitted by law, this Agreement will be governed by and construed according to the laws of the State of Delaware.

**7.2 Severability.** In case any one or more of the provisions, subsections, or sentences contained in this Agreement shall, for any reason, be held to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect the other provisions of this Agreement, and this Agreement shall be construed as if such invalid, illegal or unenforceable provision had never been contained herein.

**7.3 Successors and Assigns.** This Agreement is for the benefit of the Company, its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers, and will be binding upon my heirs, executors, administrators and other legal representatives, and as such may be assigned by the Company at any time without my consent to its successors, assigns, parent corporations, subsidiaries, affiliates, and purchasers.

**7.4 Survival.** The provisions of this Agreement shall survive the termination of my employment, regardless of the reason, and the assignment of this Agreement by the Company to any successor in interest or other assignee.

**7.5 Employment At-Will.** I agree and understand that nothing in this Agreement shall change my at-will employment status or confer any right with respect to continuation of employment by the Company, nor shall it interfere in any way with my right or the Company's right to terminate my employment at any time, with or without cause.

**7.6 Waiver.** No waiver by the Company of any breach of this Agreement shall be a waiver of any preceding or succeeding breach. No waiver by the Company of any right under

this Agreement shall be construed as a waiver of any other right. The Company shall not be required to give notice to enforce strict adherence to all terms of this Agreement.

**7.7 Advice of Counsel.** I ACKNOWLEDGE THAT, IN EXECUTING THIS AGREEMENT, I HAVE HAD THE OPPORTUNITY TO SEEK THE ADVICE OF INDEPENDENT LEGAL COUNSEL. THIS AGREEMENT SHALL NOT BE CONSTRUED AGAINST ANY PARTY BY REASON OF THE DRAFTING OR PREPARATION HEREOF.

**7.8 Certification of Compliance.** I agree that upon termination of my employment with the Company, for any reason, I shall re-review this Agreement, and I shall sign and remit to the Company a *Certification* of my compliance with this Agreement, in the form attached hereto as **Exhibit A**, no later than five (5) days after the effective date of my termination of employment with the Company.

**7.9 Entire Agreement.** This Agreement is the final, complete and exclusive agreement of the parties with respect to the subject matter hereof and supersedes and merges all prior discussions between us. No modification of or amendment to this Agreement, nor any waiver of any rights under this Agreement, will be effective unless in writing and signed by the parties. Any subsequent change or changes in my duties, salary or compensation will not affect the validity or scope of this Agreement.

**7.10 Effective Date**. This Agreement shall be effective as of the date noted below.

**I have read this agreement carefully and understand its terms. I accept and agree to the terms and conditions of this Agreement:**

Dated: _3 - 8 - 16_

_(signature)_
**(Signature)**

HENRY LACHER
**(Printed Name)**

**Exhibit A**

**TO:**          _____

**FROM:**      _____

**DATE:**      _____

**SUBJECT:**   **Certification of Compliance with *Proprietary Information and Post-Employment Restrictions Agreement* ("Agreement")**

I certify that I have received a copy of the Proprietary Information and Post-Employment Restrictions Agreement ("Agreement") I signed in connection with my employment by Aramark in the position of Facilities District Manager  I certify that I have complied with, and will continue to comply with, the Agreement including, without limitation:

1.      My obligations, pursuant to Section 1 of the Agreement, to preserve the confidentiality of all Proprietary Information belonging to the Company, and to not use any Company Proprietary Information, except to perform my job duties and responsibilities for and on behalf of the Company during my employment with the Company;

2.      My obligations of non-solicitation pursuant to Section 3 of the Agreement; and

3.      My obligations of non-competition pursuant to Section 3 of the Agreement.

I understand that this *Certification* in no way limits my rights and obligations or the Company's rights and obligations, under the Agreement.

After my employment with the Company ends, it is my plan to be employed by or to otherwise provide services to

_____

_____

which is in the business of

_____,

and that I will be working with that entity in connection with the following projects, services or products:

_____

_____

_____

_____

_____

_____

Dated:

_____          _____

_____                                                           Signature

# Exhibit B



February 7, 2017

Levi Gaston
~~████████████████~~
~~████████ TX █████~~

Dear Levi,

Congratulations! We are excited to offer you the details of your new assignment with Aramark. The purpose of this letter is to confirm our offer to you, including compensation and other details related to your new position with Aramark. Here are the employment offer details:

**Position, Pay and Benefits**

**Position:** Your position will be that of Custodial Manager, at Galena Park ISD, Career Band 7, reporting to Thomas Etchechury, District Manager.

**Start Date:** Your anticipated start date will be 2/27/2017.

**Compensation:** Your salary will be $75,000.00 annually. You will be paid bi-weekly.  This will be reviewed at the end of Fiscal Year 2017 and you may be eligible for a salary increase based upon the results of your performance evaluation. Any increase awarded will be effective January 1, 2018 and prorated accordingly. Your position is exempt, which means that you are not eligible to receive overtime pay. Your hours may fluctuate from week to week and the salary you receive for each week is intended to compensate you for all hours worked that week.

**Front Line Manager Bonus:** You will be eligible to participate in Aramark's Front Line Manager Bonus Plan for 2017, subject to all of the terms and conditions of the Front Line Manager Bonus Plan documents.  As further described in the Plan, if you are eligible to receive a Front Line Manager Bonus, the amount of your Bonus will be determined on the basis of Aramark performance measured against certain annual financial and/or non-financial goals, objectives and achievements.  The guideline bonus for your new position is 10% of your base salary, less payroll taxes and other deductions.  Your actual bonus paid in Fiscal Year 2017 will be pro-rated as appropriate.

**Benefits:**  You will be eligible to participate in Aramark's Salaried Benefits Program, subject to the terms and conditions of such benefits and benefit plans, and subject to any legal requirements or limitations.  These benefits include, but are not limited to,

medical, life, and disability insurances, Aramark's Employee Assistance Program, Retirement Income Plan and paid time off.

## Pre-Employment Paperwork and Other Requirements

**Background Check:**  Based on your new position with Aramark, Aramark conducts background checks dependent upon role and responsibilities.  Please sign and return the included Disclosure Regarding Background Investigation and Authorization of Background Investigation, as well as the included Criminal History Self-Disclosure Form and the Drug and/or Alcohol Testing Consent Form, if applicable. The background check may include, but is not limited to, one or more of the following: criminal history check, sexual offender registry check, fingerprinting, Motor Vehicle Report, health screening, employment history verification and/or reference check. If a pre-employment drug test is required, instructions regarding completion of the drug test are included with this letter, and the drug test must be completed within five (5) calendar days of receipt of this letter.

**Documents to Complete in Paper and Electronically**:   There are a number of documents included with this letter.  Please review them carefully, completing and **immediately returning** those that require your completion. These include, but are not limited to, the following:

- Business Conduct Policy;
- Disclosure Regarding Background Investigation and Authorization of Background Investigation;
- Criminal History Self-Disclosure Form; and
- Drug and/or Alcohol Testing Consent Form

There are additional documents that must be completed electronically.  These include Section 1 of the Form I-9, payment method election, W-2 receipt method election, Affordable Care Act Notice, and Work Opportunity Tax Credit questionnaire.  If you are new to Aramark, upon completion of satisfactory background checks you will receive an email with information and directions to complete these forms electronically. **These documents must be completed no later than your first day of work.**

**Form I-9:**  In order for Aramark to comply with the Immigration Reform and Control Act, you must provide documentation confirming your identity and eligibility to work in the United States within three (3) business days of your first day of work with Aramark. A copy of the Form I-9 Lists of Acceptable Documents is included with this letter.  Please note that because Aramark participates in E-Verify, we can accept only those List B documents that contain a photograph.

## Other Information

**Proprietary Information:**  During the course of your employment with Aramark, you will receive information and documents from Aramark that contain confidential or proprietary

trade information concerning Aramark's business and business relationships ("Proprietary Information").  By accepting our offer of employment, you agree that at no time while employed by Aramark, or after the employment has ended for any reason, will you use any Proprietary information for any purpose not related to your employment duties at Aramark, or disclose any Proprietary Information to any person, firm or entity not associated with Aramark.  At the end of your employment with Aramark, you agree that you will return to Aramark all such Proprietary Information, including, but not limited to, all manuals, client and supplier lists, and training and policy materials, as well as all Aramark property.

**Obligations To Prior Employers**:  By signing this letter and accepting Aramark's offer of employment, you are agreeing that (1) you have disclosed to Aramark the existence and nature of any obligations you owe to any prior employers, including any agreements that restrict your ability to compete with your prior employers or to solicit their clients, customers, or employees, (2) your employment with Aramark will not violate any of your post-employment obligations to your prior employers, and (3) you will not use or disclose any of your prior employers' confidential or proprietary information or trade secrets in the course of your employment with Aramark, unless such information is readily available to the public.

**Employment At Will**: Your employment with Aramark is "at will", which means that either you or Aramark can terminate your employment relationship at any time for any reason, with or without cause and with or without notice.  Because your employment with Aramark will be "at will", neither this offer of employment nor any other Aramark communication or document given to you shall alter, or shall be deemed or interpreted to alter, the "at will" employment relationship between you and Aramark.

**Offer Contingency**:  This offer of employment with Aramark is contingent upon the following:

- Your ability to provide timely and satisfactory documentary proof of your identity and eligibility to work in the United States as described above.
- Satisfactory background check
- If applicable, satisfactory drug test results, as well as successful completion of the conditional applicant health process.
- Your return of a copy of this letter, after being signed by you without modification, no later than 2/13/2017, after which time this offer will expire.

**Entire Agreement:**  This letter sets forth the entire understanding between you and Aramark with respect to all aspects of the offer of employment.  Any and all previous agreements or understandings between or among you and Aramark regarding topics addressed in this letter, whether written or verbal, are superseded by this letter.  Any modifications to this letter must be in writing and signed by both you and Aramark.

Again, congratulations!  We are excited to have you join the Aramark team.  If you have any questions, feel free to contact me at 215-409-7351.

Sincerely,

Matthew Brown
brown-matthew2@aramark.com

Please return the signed offer letter to the Candidate Care Team via scanned copy to offers@aramark.com no later than 2/13/2017.

_____
(Please Print Name)

_____          _____
(Please Sign Name)                                        Date

# Exhibit C



June 7, 2016

David Masonoff
████████████████████
████████████████

Dear David,

**Congratulations!** We are excited to offer you the opportunity to join the Aramark team. Here are the employment offer details:

## Position, Pay and Benefits

**Position:** Your position will be that of Food Service Director, at Lees McRae College, Career Band 7, reporting to Clete Myers, District Manager.

**Start Date:** Your start date will be 6/27/2016.

**Compensation:** Your salary will be $67,000.00 annually. You will be paid bi-weekly. Your position is exempt, which means that you are not eligible to receive overtime pay. Your hours may fluctuate from week to week and the salary you receive for each week is intended to compensate you for all hours worked that week.

**Front Line Manager Bonus:** You will be eligible to participate in Aramark's Front Line Manager Bonus Plan for 2016. As further described in the Plan, if you are eligible to receive a Front Line Manager Bonus, the amount of your Bonus will be determined on the basis of Aramark performance measured against certain annual financial and/or non-financial goals, objectives and achievements. The guideline bonus for your new position is 10% of your base salary, less payroll taxes and other deductions. Your actual bonus paid in Fiscal Year 2016 will be pro-rated as appropriate.

**Relocation:** Aramark will facilitate your relocation. The relocation benefits will be paid as described in the Aramark Relocation Policy (enclosed). By signing this offer letter, you agree that, should you voluntarily decide to leave Aramark's employment at any time within 12 months of your relocation date, you will reimburse Aramark for the above mentioned relocation assistance based on the scale described in the Aramark Relocation Policy document.

**Benefits:** You will be eligible to participate in Aramark's Salaried Benefits Program, subject to the terms and conditions of such benefits and benefit plans, and subject to any legal requirements or limitations. These benefits include, but are not limited to,

will you use any Proprietary information for any purpose not related to your employment duties at Aramark, or disclose any Proprietary Information to any person, firm or entity not associated with Aramark. At the end of your employment with Aramark, you agree that you will return to Aramark all such Proprietary Information, including, but not limited to, all manuals, client and supplier lists, and training and policy materials, as well as all Aramark property.

**Employment At Will:** Your employment with Aramark is "at will", which means that either you or Aramark can terminate your employment relationship at any time for any reason, with or without cause and with or without notice. Because your employment with Aramark will be "at will", neither this offer of employment nor any other Aramark communication or document given to you shall alter, or shall be deemed or interpreted to alter, the "at will" employment relationship between you and Aramark.

**Offer Contingency:** This offer of employment with Aramark is contingent upon the following:

- Your ability to provide timely and satisfactory documentary proof of your identity and eligibility to work in the United States as described above.
- Satisfactory background check and, if applicable, drug test results, as well as successful completion of the conditional applicant health process.
- Your return of the enclosed copy of this letter, after being signed by you without modification, no later than 6/10/2016, after which time this offer will expire.

**Entire Agreement:** This letter sets forth the entire understanding between you and Aramark with respect to all aspects of the offer of employment. Any and all previous agreements or understandings between or among you and Aramark regarding topics addressed in this letter, whether written or verbal, are superseded by this letter. Any modifications to this letter must be in writing and signed by both you and Aramark.

Again, congratulations! We are excited to have you join the Aramark team. If you have any questions, feel free to contact me at (215) 409-7943.

Sincerely,


Lauren Gambrino
gambrino-lauren@aramark.com



Please return the signed offer letter to the Candidate Care Team via scanned copy to offers@aramark.com no later than 6/10/2016.


David S. Masonoff

# Exhibit D



----- Forwarded Message -----
**From:**
**To:**
**Sent:**
**Subject:**

**From:** Aramark Global Compensation Department
**Sent:** Monday, February 26, 2018 11:27 AM
**Cc:** McKee, Lynn <McKee-Lynn@aramark.com>; Battaglia, Silvana <Battaglia-Silvana@aramark.com>; Augelli, Michael <Augelli-Michael@aramark.com>; Serpentine, Nicholas R. <Serpentine-Nicholas@aramark.com>; Goldschmidt, Kevin <Goldschmidt-Kevin@aramark.com>; Kavanagh, Ryan <Kavanagh-Ryan@aramark.com>
**Subject:** ANNOUNCEMENT: FY18 MIB Bonus Plan Communication: Bands 3-5
**Importance:** High

          **Global Compensation**

We are pleased to communicate the FY2018 Management Incentive Bonus (MIB) Plan design.

Outlined below is a comparison between the 2017 MIB and the 2018 MIB for employees in Bands 3-5.

The plan is remaining mostly unchanged in 2018, however, highlighted below is one significant adjustment to the 2018 MIB for employees in Bands 4 and 5 operations roles:

| | Metric | Metric Weight | Prior Plan (FY17) | New Plan (FY18) |
|---|---|---|---|---|
| | | | Performance Leverage Curve (Min – Target – Max) | Performance Leverage Curve (Min – Target – Max) |
| **Band 4-5** **Operations** | AOI | 50% | 95% - 100% - 105% | 90% - 100% - 110% |
| | Revenue | 40% | 90% - 100% - 110% | 90% - 100% - 110% |
| | IOs | 10% | Varies | Varies |
| **Band 3-5** **All Others** | AOI | 50% | 95% - 100% - 105% | 95% - 100% - 105% |
| | Revenue | 40% | 90% - 100% - 110% | 90% - 100% - 110% |
| | IOs | 10% | Varies | Varies |

Attached is the MIB Plan Summary which includes:

- Description of the 2018 MIB Plan

- Example calculation

- Details on plan terms and conditions, including Individual Objectives (IOs)

You are encouraged to review the summary in detail.

Please note that receipt of this email does not guarantee participation in the bonus program.  The interpretation and administration of the FY2018 MIB Plan is subject to the terms and conditions as defined in the MIB Plan Document.

If you have any questions about the MIB, please contact your HR representative.

Thank you.



# FY18 Management Incentive Bonus (MIB)
## - Band 3 to 5 Participants



## Highlights

- **NEW** for FY18 – **AOI leverage curve incentivizes maximum performance for Band 4-5 Operations**
- **NEW** for FY18 – **Individual Objectives (IOs) focus on productivity initiatives**
- **AOI** and **Revenue** financial metrics **remain** as measures from prior year
- **Weighting remains consistent -** Financial metrics - 90% and Individual Objectives (IOs) - 10%
  - AOI        50%
  - Revenue    40%
  - IOs        10%
- IOs measured on Labor Productivity, New Business and Retention, and Engagement scores

## Design

| | Metric | Metric Weight | Prior Plan (FY17) Performance Leverage Curve (Min - Target - Max) | New Plan (FY18) Performance Leverage Curve (Min - Target - Max) |
|---|---|---|---|---|
| **Band 4-5 Operations** | AOI | 50% | 95% - 100% - 105% | 90% - 100% - 110% |
| | Revenue | 40% | 90% - 100% - 110% | 90% - 100% - 110% |
| | IOs | 10% | Varies | Varies |
| **Band 3-5 All Others** | AOI | 50% | 95% - 100% - 105% | 95% - 100% - 105% |
| | Revenue | 40% | 90% - 100% - 110% | 90% - 100% - 110% |
| | IOs | 10% | Varies | Varies |

## Team Goals

**NOTE:** Team Goals apply to AOI and Revenue metrics only. Performance is split between a participant's primary responsibility (80%) and his/her team goals (20%). Leverage curves may vary when applying team goal. HQ participants do not have team goals.

| US Food & Facilities Sectors | | |
|---|---|---|
| Job | Primary 80% | Team 20% |
| DM | District | Region |
| RVP | Region | LOB |

| DSD Sector | | |
|---|---|---|
| Job | Primary 80% | Team 20% |
| GM/DM | MC | Region |
| RVP | Region | LOB |

| International Sector | | |
|---|---|---|
| Job | Primary 80% | Team 20% |
| LOB Leader | Business | Country |
| Func. Leader | Country | Region/ Aramark |

# FY18 MIB - Summary

# FY18 Management Incentive Bonus (MIB)
## - Band 3 to 5 Participants



**Example**

**Steps to Calculate Payout**
1. Performance = Actual divided by Plan
2. Payout % is calculated using leverage curve
3. Payout for each metric is totaled by District and Region Weighted Payouts

| Job Title | Compensation | Primary Responsibility | Team Responsibility |
|---|---|---|---|
| District Manager (Food) | Base Salary = $100K<br>Target Bonus = 22%<br>Target Bonus = $22K | District | Region |

## District and Region Performance (in millions)

| Metric | District (80%) | | | Region (20%) | | |
|---|---|---|---|---|---|---|
| | Plan | Actual | Performance | Plan | Actual | Performance |
| AOI | $2.0 | $1.94 | 97% | $10.0 | $10.1 | 101% |
| Revenue | $20.0 | $20.6 | 103% | $100.0 | $97.0 | 97% |
| IO | 100% | 100% | 100% | n/a | n/a | n/a |

## Payout Calculation for District Performance

| AOI Leverage Curve | | | | Revenue Leverage Curve | | |
|---|---|---|---|---|---|---|
| | Perf % | Payout % | | | Perf % | Payout % |
| Max | 110% | 200% | | Max | 110% | 200% |
| | 103% | 130% | | | **103%** | **130%** |
| Target | 100% | 100% | | Target | 100% | 100% |
| | **97%** | **77.5%** | | | 97% | 77.5% |
| Min | 90% | 25% | | Min | 90% | 25% |

## Overall Payout

| Metric | Weight | District (80%) | | Region (20%) | | Combined Weighted Payout | Bonus Target | Total Payout |
|---|---|---|---|---|---|---|---|---|
| | | Payout % | District Weighted Payout | Payout % | Region Weighted Payout | | | |
| AOI | 50% | 77.5% | 31% | 120% | 12% | 43% | $11K | $9.5K |
| Revenue | 40% | 130% | 41.6% | 77.5% | 6.2% | 47.8% | $8.8K | $10.5K |
| IO | 10% | 100% | 10% | n/a | n/a | 10% | $2.2K | $2.2K |
| Totals | 100% | District: | 82.6% | Region: | 18.2% | Total: 100.8% | $22K | $22.2K |

**FY18 MIB - Example**

# FY18 Management Incentive Bonus (MIB)
## - Band 3 to 5 Participants



## Financial Metrics — Definitions

| | |
|---|---|
| AOI | Adjusted Operating Income inclusive of Corporate and other overhead allocations determined pursuant to the Corporation's accounting policies and procedures |
| Revenue | Sales as reported internally to Corporate Accounting and used for external financial reporting |

## Individual Objectives — By Function

| | | |
|---|---|---|
| Operations | Labor Productivity (Labor as a % of Revenue) | Actual Labor / Revenue over Plan Labor / Revenue |
| Growth | • New Business<br>• Retention | • Sales leaders measured on New Business goals<br>• Retention leaders measured on Client Retention<br>• Growth leaders measured on both |
| Finance | Free Cash Flow | An amount equal to operating cash flow minus capital spending |
| All Others | Engagement | Measured by total LOB/Country Sector/Function, +1% v PS |
| IO Scoring | Operators will be aligned to the businesses that they support. Growth and all other employees within a HQ function, LOB, or function within an LOB, will receive the same score within their assigned IO measure. Finance employees will be measured at the Corporate level (total Aramark) **only**. Final scores of individual participants are subject to Senior Leadership approval. Further guidance will be provided regarding actual IO calculations. | |

## Terms — Eligibility and Proration

| | |
|---|---|
| Eligible | • Band 3 to 5 non-sales bonus eligible employees<br>• Must be employed by Aramark for 6 months in the fiscal year<br>• Must be employed by Aramark on the final day of the fiscal year |
| Proration | If the participant is a new hire or works in two or more units, the earned award will be prorated on the portion of the year served in each unit, against the full year of financial performance.  Proration is number of months worked divided by 12. |
| Conditions | The interpretation and administration of the FY18 MIB Plan is subject to the terms and conditions as defined in the MIB Plan Document. |

## FY18 MIB – Measures and Plan Terms

# Exhibit E

# FY18 Front Line Manager Bonus (FLM)



**Example**                                                                              Participant

| Job | Compensation | Responsibility |
|---|---|---|
| FLM | Base - $70K<br>Target Bonus - 10% | Profit Center |

## Example Performance (in thousands)

| Metric | Account Plan | Account Actual | Account Performance |
|---|---|---|---|
| FLC | **$500** | **$525** | **105.0%** |
| Revenue | $5,000 | $4,900 | 98.0% |
| IO | 100.0% | 100.0% | 100.0% |

## Example Calculation

| FLC Leverage Curve | Perf | Payout |
|---|---|---|
| Max | 110% | 150% |
| | **105%** | **125%** |
| Target | 100% | 100% |
| | 95% | 62.5% |
| Min | 90% | 25% |



Steps to Calculate Payout
1. Performance = Actual divided by Plan
2. Payout percentage is calculated using leverage curve
3. **In the example, 105% performance = 125% payout**
4. Payouts for each metric are totaled by weight
5. Result is the bonus earned

## Example Totaling Payout

| Metric | Weight | Profit Center Perf | Profit Center Payout | Bonus Target | Total Payout |
|---|---|---|---|---|---|
| FLC | 40% | **105.0%** | **125.0%** | $2.8K | $3.5K |
| Rev | 40% | 98.0% | 85.0% | $2.8K | $2.4K |
| IO* | 20% | 100.0% | 100.0% | $1.4K | $1.4K |
| Totals | | | | $7.0K | $7.3K |

*IO performance based on individual FLM

FY18 FLM - Example

# FY18 Front Line Manager Bonus (FLM)



| Measures | Descriptions |
|---|---|
| FLC | Front Line Contribution determined by: Revenue – Operating Expenses (Food, Labor and Direct Expenses). FLC generally excludes NVDs and Overhead Costs. |
| Revenue | Revenue as reported internally to Corporate Accounting and used for external financial reporting. |
| Client Budget | Performance against budget as defined by the client, in client interest accounts. |
| Labor Productivity | Actual Labor / Revenue over Plan Labor / Revenue |
| Partnership Value Index (PVI) | PVI results relative to previous year. |
| Patient Satisfaction (Food) | The percentile achieved on a national 3rd party survey when comparing survey scores against the largest database available (not peer group). To qualify, the score also must be greater than or equal to the hospital. Average Score between October and August (or September, if available). |
| HCAHPS Satisfaction (EVS) | The top box achieved on a national 3rd party survey when comparing survey scores against the largest database available (not peer group). To qualify, no more than 5 points below the hospital. Average Score between October and August (or September, if available). |
| Net Promoter Score | The Net Promoter Score derived from the Customer Satisfaction survey. |

| Terms | Eligibility and Proration |
|---|---|
| Eligible | • Band 8 to 6 Front-Line Managers<br>• Must be employed by Aramark for 6 months in the fiscal year<br>• Must be employed by Aramark on the final day of the fiscal year |
| Proration | If the participant is a new hire or works in two or more units, the earned award will be prorated on the portion of the year served in each unit, against the full year of financial performance. Proration is number of months worked divided by 12. |
| Conditions | The interpretation and administration of the FY18 FLM Plan is subject to the terms and conditions as defined in the FLM Plan Document. |

## FY18 FLM - Measures and Plan Terms

# FY18 Front Line Manager Bonus (FLM)



## Highlights

- Financial metrics focused on Front Line Contribution (FLC) and Revenue
- Financial metrics - 80% and Individual Objectives (IOs) - 20%

  | | |
  |---|---|
  | FLC | 40% |
  | Revenue | 40% |
  | IOs | 20% |

- FLM Individual Objectives (IOs) focus on productivity initiatives
- Leverage Curves incentivize maximum performance against each metric

## Design

Performance is measured for each metric and payout is determined using the FLM leverage curves. Please refer to example calculation on the next page.

| | Cost Plus (Fee Accounts) | | | | P&L Accounts | | |
|---|---|---|---|---|---|---|---|
| **Metric** | Metric Weight | Performance (Min – Max) | Payout (Min – Max) | **Metric** | Metric Weight | Performance (Min – Max) | Payout (Min – Max) |
| **FLC** | 40% | 90% - 110% | 25% - 150% | **FLC** | 40% | 90% - 110% | 25% - 150% |
| **Client Budget** | 40% | 102% - 85% | 25% - 150% | **Revenue** | 40% | 90% - 110% | 25% - 150% |
| **IOs** | 20% | Varies | Varies | **IOs** | 20% | Varies | Varies |

## IOs — Individual Objective Assigned to Each LOB

| Industry | Cost Plus (Fee Accounts) | P&L Accounts |
|---|---|---|
| **Sports and Entertainment** | | |
| **Leisure** | | |
| **Corrections** | Labor as % of Revenue & Partnership Value Index (PVI) | |
| **Business Dining** | | |
| **K-12 Education** | | |
| **Higher Education** | Labor as % of Revenue & Partnership Value Index (PVI) | |
| **Facilities** | | |
| **Healthcare** | Patient Satisfaction & Partnership Value Index (PVI) | |
| **Technologies** | Net Promoter Score | |

# FY18 FLM - Summary

# Exhibit F

## Fwd: Attention Required: Important Notice Regarding FY18 Bonus

From: 

To:

Date:

**From:** myCareer Performance & Compensation <performance-compensation@aramark.com>
**Date:** December 3, 2018 at 2:01:46 PM EST
**To:** <lacher-henry@aramark.com>
**Subject: Attention Required: Important Notice Regarding FY18 Bonus**
**Reply-To:** <performance-compensation@aramark.com>



All US Bonus Eligible Employees,

This is to inform you that bonus payments, historically paid in December, will be paid in February. We know this timing is an inconvenient change, and greatly appreciate everyone bearing with us as we take some extra time to finalize the process as quickly as we can.

Please note that performance reviews will be conducted over the coming weeks and merit increases will continue to be effective at the end of the calendar year and reflected in paychecks in January 2019.

View this email online.

1101 Market Street
Philadelphia, PA | 19107 US

This email was sent to lacher-henry@aramark.com.

# Exhibit G

**Lacher, Henry**

| | |
|---|---|
| **From:** | Aramark HR EVP Lynn McKee <internalcommunications@aramark.com> |
| **Sent:** | Tuesday, January 29, 2019 11:48 AM |
| **To:** | Lacher, Henry |
| **Subject:** | Update: Incentive Pay |

**aramark⌋**

It is still January, so belated New Year's wishes. As we head into February, I wanted to share an important update and preview some upcoming news.

As you may know, public companies typically have a window of several months to award bonus and incentive payments. Within the Aramark program, the payout window is from December thru mid-March and eligible employees can expect payouts to occur during that timeframe each year. This year's payout will occur on Friday, February 15. Communications will begin in the next few days and we will reach everyone by the end of this week.

On another note, we have also been doing a comprehensive analysis of how to invest Aramark's savings from the new tax law changes to benefit our workforce. Our "Enriching and Nourishing Lives" mission has led us in a variety of directions that you will be hearing about soon. Let me give you an idea of just a few of the areas we are focused on:

- Special recognition compensation
- Training and development
- Retirement plans

The actions that we will announce shortly have been carefully thought out and designed with one goal in mind: to strengthen Aramark by strengthening our employees. Stay tuned for more information about these exciting developments.

Thank you for your continued dedication and contributions to our company.

*Lynn*

# Exhibit H



**From:**
**Sent:**
**To:**
**Subject:**



Sent from Mail for Windows 10

---

**From:**
**Sent:**
**To:**
**Subject:**

CAUTION: This email originated from outside ███████████. Do **not click** links or open attachments unless you recognize the sender and know the content is safe.

---

Levi Gaston
Director of Custodial Services
14711 Scotter Dr
Houston, TX 77015
O: 832.386.1212 | M: 713.754.0854

---

**From:** Bennett, Galen
**Sent:** Thursday, September 27, 2018 7:37 AM
**To:** Gaston, Levi <Gaston-Levi@aramark.com>
**Subject:** Fwd: Bonus - Levi Gaston

Fyi

Sent from my iPhone

Begin forwarded message:

> **From:** "Kirk, Theresa M." <Kirk-Theresa@aramark.com>
> **Date:** September 27, 2018 at 7:31:08 AM CDT
> **To:** "Bennett, Galen" <Bennett-Galen@aramark.com>

Cc: "Shirodkar, Jason" <Shirodkar-Jason@aramark.com>
**Subject: RE: Bonus - Levi Gaston**

Yes he will be eligible for bonus since his last day is 9/30.

Thanks,
Terry

**Terry Kirk SPHR-SCP | Aramark | HR Director | Facilities Services | Texas & West Regions**
**M: 972-768-2357   MyHR: 1-844-441-myHR (6947)**

© 2018 Aramark. All rights reserved. This communication, including attachments, is for the exclusive use of addressee as directed by Aramark and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.
**PLEASE PRINT RESPONSIBLY**

---

**From:** Bennett, Galen
**Sent:** Wednesday, September 26, 2018 4:38 PM
**To:** Kirk, Theresa M. <Kirk-Theresa@aramark.com>
**Cc:** Shirodkar, Jason <Shirodkar-Jason@aramark.com>
**Subject:** Bonus - Levi Gaston
**Importance:** High

Terry,

I am with Levi today and tomorrow. Levi has asked me to confirm he will be eligible for his bonus payout for 2018.   He is aware of the terms which indicate employment to the end of the year.  Since his last day will be the 30th would assume he is eligible.   We did the same for Bob Campbell at Galena when we shut down POM and he terminated.

Please confirm,

Thanks,

Galen

**Galen Bennett CPMM | Aramark | District Manager | Facilities |**
295 Private Road 124
Ravenna, Texas  75476

**M**  903.449.9062
**EMAIL** bennett-galen@aramark.com

© 2014 Aramark. All rights reserved. This communication, including attachments, is for the exclusive use of addressee as directed by Aramark and may contain proprietary, confidential and/or privileged information. If you are not the intended recipient, any use, copying, disclosure, dissemination or distribution is strictly prohibited. If you are not the intended recipient, please notify the sender immediately by return e-mail, delete this communication and destroy all copies.
**PLEASE PRINT RESPONSIBLY**

# Exhibit I

**Lacher, Henry**

| | |
|---|---|
| **From:** | myCareer Performance & Compensation <performance-compensation@aramark.com> |
| **Sent:** | Friday, February 01, 2019 6:15 PM |
| **To:** | Lacher, Henry |
| **Subject:** | FY18 Bonus Update |

# aramark ⊃

## FY'18 Bonus

As you are aware, we have been working to finalize the FY 2018 bonus payouts.

While fiscal year 2018 was a good year for the total company, it was a year in which we saw great disparity in the financial performance across our US businesses which impacted bonus payments.

This resulted in a decision not to pay Fiscal Year performance bonuses for bands 5-8 in the US.

## FY'19 – Special Recognition Award

We recognize and value the contributions of our key leaders. We are pleased that we have the opportunity to utilize some of the tax reform benefits received by the company to make a one-time special recognition award to select US leaders. You are one of those leaders. The amount of these awards will be the same for eligible employees within each band.  Payments will be made on February 15, 2019.

As a Band 5 leader, you will receive $27,500.

We value your continued leadership and commitment to Aramark.

View this email **online**.

2400 Market Street
Philadelphia, PA | 19103 United States

This email was sent to lacher-henry@aramark.com.
*To continue receiving our emails, add us to your address book.*

1